**COMMONWEALTH OF VIRGINIA,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant,**

**Crusade for Voters et al., Defendants-Intervenors.**

**Civ. A. No. 1100–73.**

United States District Court,
District of Columbia.

Sept. 18, 1974.

Judgment affirmed Jan. 27, 1975.
See 95 S.Ct. 820.

Andrew P. Miller, Atty. Gen. of the Commonwealth of Virginia, Richmond, Va., for plaintiff.

Sidney R. Bixler, Dept. of Justice, Washington, D. C., for defendant.

Eric Schnapper, New York City, for defendants-intervenors.

Before TAMM, Circuit Judge, and GASCH and BRYANT, District Judges.

## MEMORANDUM AND ORDER

### PER CURIAM.

This is an action in which the Commonwealth of Virginia seeks a declaratory judgment exempting it from coverage by the Voting Rights Act of 1965, 42 U.S.C. § 1973. Section 4(a) of the Act forbids the application, in any jurisdiction covered by the section, of any literacy test or of any other "test or device" as defined by the Act.[1] Section 5 provides that no new election law or procedure may be put into operation in a jurisdiction to which the prohibitions of Section 4(a) apply unless the new law or procedure has been approved by the Attorney General or the United States District Court for the District of Columbia.[2] If this court finds that Virginia is entitled to an exemption under 4(a), it will no longer be subject to the constraints of Sections 4(a) or 5.[3]

Pursuant to Section 4(b), the constraints of Sections 4(a) and 5 "apply in any State or in any political subdivision of a state which

1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which

2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964."

The literacy test at issue is the requirement in Section 20 of the Constitution of Virginia that a person wishing to register "make application to register in his own handwriting, without aid, suggestion, or memorandum."[4] The Attorney General and the Director of the Census made the required determinations on August 7, 1965. (30 Fed.Reg. 9897). Those determinations are not subject to judicial review.

Section 4(a) provides, however, that a covered state may obtain an exemption by proving that any test or device which it maintained in the past ten years did not have the "purpose or effect" of discriminating on the basis

---

1. Section 4(a), 42 U.S.C. § 1973b(a), provides:

    "To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit . . ."

    and Section 4(c), 42 U.S.C. § 1973b(c), provides:

    "The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class".

2. 42 U.S.C. § 1973c.

3. Even if an exemption were granted, Virginia would not be able to reinstitute literacy tests or any other test or device until at least August 6, 1975, because of the national ban on such tests or devices. See 42 U.S.C. § 1973aa. However, Virginia would no longer be subject to the constraints imposed by Section 5 on changes in its electoral practices.

4. In 1971, the Virginia Constitution was amended to repeal this literacy requirement.

of race.[5] On June 5, 1973, the Commonwealth of Virginia brought this action for a declaratory judgment to remove itself from the constraints of the Act. After the statutory three-judge court was designated on October 23, 1973, the Commonwealth of Virginia, defendant United States of America, and defendant-intervenor Crusade for Voters each moved for summary judgment.

Under the Voting Rights Act, in order to gain an exemption, a state or political subdivision "need do no more than submit affidavits from voting officials, asserting that they have not been guilty of racial discrimination through the use of tests and devices during the past five years,[6] and then refute whatever evidence to the contrary may be adduced by the Federal Government." South Carolina v. Katzenbach, 383 U.S. 301 at 332, 86 S.Ct. 803, at 820, 15 L.Ed.2d 769 (1966). Such "evidence to the contrary" may be either that a "test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color," or that there has been a "final judgment of any court of the United States . . . determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff." 42 U.S.C. 1973b(a).

In this action Virginia has satisfied the affidavit requirement through an exhaustive canvass of registrars throughout the state plus a good faith attempt to solicit information from black leaders. (See plaintiff's affidavits attached to its motion for summary judgment). While some of the responses from registrars are undoubtedly self-serving, the near-unanimity of responses and the wide scope of the search certainly satisfies the burden on Virginia to present prima facie evidence of lack of discrimination.

We turn, then, to evidence introduced by the United States and by the defendant-intervenor ("defendants").

First, defendant United States asserts that two final judgments, Wilks v. Woodruff (preliminary injunction issued September 28, 1964, Civ.No. 4073, E.D.Va.), and Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (order of district court, E.D.Va. April 11, 1969), fit within the proviso of section 4(a) and thereby bar relief. This contention need not detain us long.

■■ In *Wilks* the district judge issued a preliminary order enjoining the denial of registration to one individual and others similarly situated on the ground that the individual seeking registration had used a form different from the one offered by the registrar. The court stated:

"The court is of the opinion that the case should be decided from the bench today because the registration period expires early next month.

"The court states its findings of fact and conclusions of law only for the purpose of the interlocutory injunction. When the case is heard on

---

5. Section 4(a), 42 U.S.C. § 1973b(a) provides that Section 4 shall not apply if
"... The United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided*, That no such declaratory judgment shall issue with respect to any plaintiff for a period of ten years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this subchapter, determining that denials or abridgments of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff."

6. Amended to ten years, Voting Rights Act Amendments of 1970, Pub.L.No.91–285, June 22, 1970, 84 Stat. 314.

its merits, the court may modify its findings and conclusions."

A search of the complete transcript of the hearing shows no evidence of anything resembling a determination that denials or abridgments of the right to vote on account of race or color through the use of a test or device had occurred. Nor is the *Wilks* order a "final judgment." While the case was later dismissed as moot, that does not convert an interlocutory injunction into a final judgment. Contrary to the argument of the United States, a final judgment is not merely the "last order," but rather must be a decision on the merits which is not provisional and subject to change by the same tribunal.[7]

■ Nor does *Allen* help the United States. In *Allen,* plaintiffs argued that a Virginia statute requiring write-invotes to be in the voter's own handwriting violated the Fourteenth Amendment and the Voting Rights Act. After the district court held that the handwriting requirement was not a "test or device," 268 F.Supp. 218 (1967), the Supreme Court reversed and remanded on other grounds, holding that a memorandum concerning voter-assistance procedures did not fall within Section 5 of the Act and therefore required clearance with the Attorney General. 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). On remand, the order of the district court merely carried out the direction of the Supreme Court and enjoined the memorandum pending satisfaction of the clearance requirements of Section 5. Nowhere in any opinion is there a court finding of racial discrimination. While in both *Wilks* and *Allen* evidence underlying the original cases may be relevant to this action if properly presented, these so-called final judgments do not by themselves bring this case within the proviso of Section 4(a).

Defendants' second theory is directed to "purpose". They present undisputed and conclusive evidence that the 1901–02 Virginia Constitutional Convention that drafted section 20 of the Virginia Constitution was motivated primarily by a desire to exclude blacks from voting in any significant number.[8] This raises the question of whether intent must be shown for the covered period of use, namely 1963–65, or whether it is sufficient to show that the original drafting of the provision sixty years earlier was discriminatory. We do not have to reach this issue, however, in view of our decision on the *Gaston County* argument, discussed below.

We turn now to the third and strongest theory, directed to "effect." Since there was no test or device in use from August 7, 1965 to the present, the issue is whether Virginia's literacy test was used with a discriminatory effect between 1963 and 1965. Defendants argue that the Supreme Court's decision in Gaston County, North Carolina v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), plus undisputed statistics presented as exhibits to their respective motions for summary judgment, compel a conclusion that there is no issue of material fact on this theory and that they are entitled to summary judgment as a matter of law. We agree.

In *Gaston County*, the county sued under 42 U.S.C. § 1973b(a) to reinstate its literacy test. The Supreme Court held that

"in an action brought under § 4(a) of the Voting Rights Act of 1965, it is appropriate for a court to consider whether a literacy or educational requirement has the 'effect of denying . . . the right to vote on account of race or color' because the State or subdivision which seeks to impose the requirement has maintained sepa-

---

7. 46 Am.Jur.2d Judgments § 457, p. 627 (1969) ; Cf. Hoffman v. Blaski, 363 U.S. 335 at 340, n. 9, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960).

8. See Excerpts from the Report of the Proceedings and Debates of the Constitutional Convention, State of Virginia, 1901–1902, Exhibits A and B to Intervenor's Motion for Summary Judgment, and see Appendix I to Defendants' Motion for Summary Judgment.

rate and inferior schools for its Negro residents who are now of voting age.' 395 U.S. 285 at 293, 89 S.Ct. at 1724. The United States brought evidence that the school system had been segregated by race during the period during which county voters (presumed to have grown up locally) had been educated. It then showed evidence of a wide disparity between black and white school systems, using "input" indices of teacher salaries, percentages of teachers with state certification, per-pupil valuation of school property and percentages of children attending one-room, one-teacher schoolhouses. It also presented "output" statistics from the 1960 census in the form of educational levels reached: "the proportion of Negros with no schooling whatever was twice that of whites in Gaston County; the proportion of Negros with four or less years of education was slightly less than twice that of whites." 395 U.S. 285 at 294-295, 89 S.Ct. at 1725.

The United States then made the same argument it makes here—that many black potential voters were rejected outright and that many others were discouraged from even trying to register on account of their lack of a literate education, a lack resulting from the county's maintenance of a segregated and inferior school system. And the Supreme Court agreed with Attorney General Katzenbach that "years of violation of the 14th amendment, right of equal protection through equal education, . . . [should not] become the excuse for continuing violation of the 15th amendment, right to vote." Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 22. 395 U.S. 285 at 289, 89 S.Ct. at 1722. Hence the Court said

> "It is only reasonable to infer that among black children compelled to endure a segregated and inferior education, fewer will achieve any given degree of literacy than will their better-educated white contemporaries. (footnote omitted) And on the Government's showing, it was certainly

proper to infer that Gaston County's inferior Negro schools provided many of its Negro residents with a subliterate education, and gave many others little inducement to enter or remain in school."

395 U.S. 285 at 295-296, 89 S.Ct. at 1725.

The Court did leave one avenue open for rebuttal, allowing the State to show the absence of a causal relationship between the educational disparity and a difference in ability to pass a literacy test.

> "Consistent with the court's holding, a State or subdivision may demonstrate that although its schools suffered from the inequality inherent in any segregated system, see Brown v. Board of Education, 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873] (1954), the dual educational system had no appreciable discriminatory effect on the ability of persons of voting age to meet a literacy requirement."

395 U.S. 285 at 291, 89 S.Ct. at 1723.

■ With the background of *Gaston County*, then, we turn to the evidence presented by defendants, and Virginia's rebuttal.

First, it is undisputed and undisputable that prior to 1954 the faculties and students of Virginia's public schools were segregated by law on the basis of race. Virginia Constitution of 1902, Art. IX, § 140, Code of Va. (1950), § 22-221. Second, even after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), Virginia's compliance with desegregation was grudging at best. See, e. g. Bradley v. School Board of City of Richmond, 325 F.Supp. 828 (E.D.Va.1971).

As to evidence of inferior quality, defendants present substantially the same statistics that were presented in *Gaston County*. (See exhibits attached to Defendant's and Defendants-Intervenors' motions for summary judgment.) Between 1907 and 1941, a time during which a substantial portion of Virginia's electorate was in school, the average

salary of teachers in Virginia's white schools was from 40% to 95% higher than the average salary of teachers in Virginia's black schools. Between 1925 and 1948, the per pupil value of white school property ranged from twice to three-and-a-half times the per pupil value of black school property. Similar disparities, some not shown in *Gaston County*, were demonstrated in the numbers of books per pupil in school libraries, the per capita costs of instruction, student-teacher ratios, percentages of one-room schoolhouses, percentages of teachers with college degrees and with state certification, and length of school term.

As for "output" data, in 1960 blacks comprised 20.8% of Virginia's population but 45.4% of its unschooled population. In 1970 blacks were 19.1% of the population, but comprised 39.1% of the totally unschooled. Among adults with four or fewer years of schooling, blacks constituted 42.6% in 1960 and 40.1% in 1970. Nor were the numbers composing these percentages trivially small; in 1960, 9.3% of all whites, or 156,886, and 29.5% of all blacks, or 116,634, had four or fewer years of schooling. The numbers were about 25% smaller in 1970. These figures vary with county, of course; for some counties they are dramatically higher.

The inferiority of Virginia's Negro school system is documented in another way. Between 1940 and 1960 many lawsuits, based on Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), advanced the theory that Virginia's Negro schools were not the equal of its white schools. Reported decisions that held the school systems to be separate but unequal include: Corbin et al. v. County School Board of Pulaski County, Virginia, 177 F.2d 924 (4th Cir. 1949) rev'g and vacating in part and remanding 84 F.Supp. 253 (W.D.Va.1949); Carter et al. v. School Board of Arlington County, Virginia, 182 F.2d 531 (4th Cir. 1950), rev'g and

remanding 87 F.Supp. 745 (E.D.Va. 1949); Roles v. School Board of City of Newport News et al., 61 F.Supp. 395 (E.D.Va.1945); Freeman et al. v. County School Board, et al., 82 F.Supp. 167 (E.D.Va.1948) aff'd 171 F.2d 702 (4th Cir. 1948); School Board of Warren County v. Kilby, 259 F.2d 497 (4th Cir. 1958); Goins v. County School Board of Grayson County, 186 F.Supp. 753 (W.D. Va.1960) application for stay denied, 282 F.2d 343 (4th Cir. 1960)

Thus we have a situation between 1963 and 1965 in which a large percentage of Virginia's black population was educated in segregated and inferior schools. As the *Gaston County* Court said,

"it is only reasonable to infer that among black children compelled to endure a segregated and inferior education, fewer will achieve any given degree of literacy than will their better-educated white contemporaries. (footnote omitted) And . . . it was certainly proper to infer that . . . inferior Negro schools provided many of its Negro residents with a subliterate education, and gave many others little inducement to enter or remain in school." 395 U.S. 285 at 295–296, 89 S.Ct. at 1725.

This result is shown clearly in the output data presented by defendants data showing glaring disparities between percentages of the black and white population with little or no schooling.

The final link in the *Gaston County* argument is the causal connection between the maintenance of inferior schools for blacks and their lesser ability to pass Virginia's literacy requirement. Between 1963 and 1965 the registration rate of black voters in Virginia was approximately ten percent below the comparable rate for white voters.[9] It can be inferred that this difference in registration came about, at least in part, because of the difference in literacy between blacks and whites. Data sub-

---

9. There is some dispute as to the exact statistics, but plaintiff concedes that the black registration rate is significantly lower than the white rate.

mitted by defendant-intervenors show a significant county-by-county variation, with a close correlation between registration rate and literacy rate. It is inferable that use of literacy tests was a factor in the differential registration rates—either because voters were rejected outright, or, more probable in view of Virginia's survey evidence, because potential registrants stayed at home out of fear of rejection and its consequent embarrassment.[10]

■ Virginia challenges defendants' argument at a variety of points. First, in an attempt to take this case outside the rule of *Gaston County,* it argues that this is not an action seeking to reinstate a literacy test. While this may change the consequences of an exemption, it does not change the criteria for obtaining one. Indeed, if Congress had thought that its literacy test ban would remedy fully the problem of voting discrimination, it could easily have lifted the Act's constraints from those states whose inclusion had been "triggered" in the past by their use of a test but in which the test was no longer a potential problem. Congress' failure to do so indicates that the Act was designed to stop other potential abuses, and not merely to ban literacy tests. This purpose is shown in the approval requirement imposed on all changes in voting laws. Eliminating the use of literacy tests does not render all possible voting law changes benign.[11]

Second, Virginia argues that use of its literacy test between 1963 and 1965 did not have the effect of excluding blacks. Its data in support include an extensive survey of voting registrars and black leaders, statistics showing a substantial growth in the black electorate between 1963 and 1965, the claim that the test was simple and straightforward and therefore not easily manipulable, and statements made during the period by representatives of the U. S. Civil Rights Commission and Department of Justice indicating their failure to find substantial discrimination in Virginia (as compared to other Southern states). This evidence is significant, and Virginia may deserve to be commended for its good faith efforts in voter registration in the sixties and for its diligence in preparing this suit. Virginia, however, does not, and probably cannot, rebut the evidence that many potential black voters stayed home and never even tried to register out of the fear of rejection and its consequent embarrassment. There are undisputed affidavits indicating that more than a thousand black adults were approached by registration drive leaders in three counties but refused to try to register because they feared the literacy test. These affidavits, the difference between black and white registration rates, and historical common sense in forming expectations of how illiterate black people who grew up in a period of segregation and bigotry will behave, negate the claim that Virginia's provision of a segregated, inferior education did not affect its voting rolls.

Finally, *Gaston County* invites Virginia to demonstrate that its dual educational system had no appreciable effect on the *ability* of persons of voting age to meet a literacy requirement.[12]

---

10. Virginia argues that a correlation between literacy and registration exists even in the absence of literacy tests. This may be so. Many factors other than literacy tests may operate to discourage voting by illiterates—fear of embarrassment, lack of knowledge, lack of interest, intimidation, or general fear of the political process. This does not negate the existence of a relationship between literacy, the ability to pass a literacy requirement, and registration rate, especially in the light of defendants' affidavits, discussed *infra.*

11. To similar effect is Virginia's argument that other states spent more on white schools and maintained literacy tests, but were not regulated by the Act. Perhaps Congress was under-inclusive, but this does not void the Act, South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), nor its application in this case.

12. For example, Virginia might show that its schools were separate but equal in the early grades, and that only its advanced facilities were unequal.

Virginia's argument on this score rests on educational theory. In essence, Virginia claims that recent research has cast doubt on the conventional wisdom that there exists a correlation between educational achievement and educational expenditure. Virginia's prime support comes from the Coleman Report and its progeny,[13] which were cited in the Supreme Court's opinion in San Antonio School District v. Rodriguez, 411 U.S. 1, 42–43, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The main conclusion drawn from this research is a negative one— various types of educational inputs, measured in terms of expenditures and the variables used in *Gaston County,* do not seem to correlate with student achievement when tested with a national statistical sample.

There are several objections to Virginia's contention. Most important, the Coleman Report measured variations in verbal achievement of those attending different schools. It did not try to measure the factors determining why students stay in school or start school. Virginia's argument, stated most strongly, is that black children begin school a grade or so behind white children and fail to close that gap regardless of how much money is spent. This may or may not be so, but this case revolves around how many children begin school or stay in school past fourth grade, not on the comparative skills of those in school. Even if we assume that black children and white children in segregated Virginia schools maintained throughout their schooling the same gap in cognitive skills with which they started, Virginia's

literacy test affected blacks more than whites because blacks had far higher rates of non-attending school or attending fewer than four grades. The Coleman data do not relate to that issue.

Even if the Coleman Report data were relevant, it would not help Virginia in this case. While expenditure by itself may not "matter", Coleman indicates that the social composition of the student body,[14] and the quality of teaching measured in many different ways,[15] do matter. We have already seen that Virginia is responsible for the state imposed segregation of its school bodies before 1954 (and perhaps for the delays after 1954), and that teacher salaries varied widely between black and white schools.

Unlike the situation in *Rodriguez,* where the Court was unwilling in the face of uncertain theory to impose a new and highly disruptive Constitutional mandate, Virginia seeks to avoid the inference drawn by the Supreme Court in *Gaston County* and by the Congress in its 1970 Amendments to the Voting Rights Act. Virginia bears a heavy burden in doing so—merely throwing doubt on some of the "conventional wisdom" of the field will not satisfy that burden.

In sum, Virginia has not presented any evidence to show that its "dual educational systems had no appreciable discriminatory effect on the ability of persons of voting age to meet a literacy requirement." 395 U.S. 285 at 291, 89 S.Ct. at 1723. Consequently the motions for summary judgment of defendant and defendants-intervenors must be granted.

---

13. J. Coleman, et al., Equality of Educational Opportunity (1966), C. Jencks, et al., Inequality, A Reassessment of the Effect of Family and Schooling in America (1972), On Equality of Educational Opportunity (D. Moynihan & F. Mosteller, eds. 1972).

14. Coleman, "The Concept of Equality in Educational Opportunity," Equal Educational

Opportunity, 9, 20 (1969); Geldon, "The Sensuous Market: An Analysis of School Finance and Exclusionary Zoning," 51 J. Urban Law, 343, 360 (1974).

15. Van de Water, "Political Pressures + More Funding = Greater Equity," 6 Compact 3 (1972).