George SMITH, et al., Plaintiffs,

v.

**BOARD OF SUPERVISORS OF BRUNSWICK COUNTY, et al., Defendants.**

**Civ. A. No. 3:91CV00599.**

United States District Court, E.D. Virginia, Richmond Division.

June 5, 1992.

As Amended June 10, 1992.

Stephen B. Pershing, American Civil Liberties Union Foundation of Virginia, Richmond, Va., Laughlin McDonald, American Civil Liberties Union Foundation, Atlanta, Ga., for plaintiffs.

Samuel Walters, Baltimore, Md., for NAACP.

Anne Gordon Greever, Sunhee Juhon, Joseph D. McCluskey, Lewis Powell, III, Hunton & Williams, Richmond, Va., for defendants.

## MEMORANDUM OPINION

SPENCER, District Judge.

This case presents a challenge to the voting redistricting plan adopted by the Board of Supervisors of Brunswick County, Virginia on July 31, 1991 ("July plan"). Plaintiffs contend that the July plan dilutes voting strength of minority voters in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973 and the fifteenth amendment of the United States Constitution.

This court properly retains jurisdiction over this case under 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1343(a)(3) and (4) (Elective franchise claim requesting equitable relief) and 28 U.S.C. § 2201 (Voting rights claim requesting declaratory relief). Venue is proper under 28 U.S.C. § 1391(b).

For the reasons stated below, this Court holds that as drafted, the July plan adopted by the Brunswick County Board of Supervisors unfairly dilutes minority voting strength in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973.

## I.

The named plaintiffs are George R. Smith, Charles White, and James A. Smith. All are black adult citizens of and registered voters in Brunswick County, Virginia. George Smith was a qualified candidate for election to the Brunswick County Board of Supervisors in November 1991.

The defendant Brunswick County Board of Supervisors has five members who are sued in their official capacities.[1] The Board is responsible for devising the election plans used in Brunswick County. The defendant Brunswick County Electoral Board has three members who are sued in their official capacities.[2] The Electoral Board conducts elections in Brunswick County. Finally, the Registrar of Brunswick County is sued in her official capacity.[3] The registrar administers County elections, including voter registration and candidate qualification.

## II.

A five-member Board of Supervisors governs Brunswick County. Each supervisor has a four-year term of office. Each is elected by a plurality of the vote from single-member districts. After the 1990 census, the Board developed a voting districting plan. The Board subsequently held public hearings during which it fielded objections. Brunswick County adopted a redistricting plan on July 31, 1991 ("the July plan").

The Attorney General of the United States has designated Brunswick as a county subject to the preclearance requirements of Section 5 of the Voting Rights Act of 1965, *as amended,* 42 U.S.C. § 1973c. The July plan was sent to the Department of Justice for preclearance on or about August 27, 1991. The Justice Department, however, could not find the plan as originally submitted and defendants forwarded a second copy on October 4, 1991. The Justice Department received the second submission on October 7.

A three judge panel convened under 28 U.S.C. § 2284 to hear plaintiffs' § 5 claim. On October 23, 1991 the three-judge court enjoined the pending November elections and any use of the July plan pending preclearance. This Court heard all subsequent matters as a single judge.

On October 24, 1991 this Court issued an order denying plaintiffs' request for inter-

---

**1.** In this opinion, the Court will occasionally refer to all defendants collectively as "the Board."

The named defendants who sit on the Board of Supervisors are: Raymond S. Daniel, Thomas B. Taylor, Walter Rice, Jr., Marion W. Peebles, and H. Paul Harrison. At the time the complaint in this case was filed, two of the board members were black: Mr. Rice and Mr. Harrison.

**2.** The named members of this Board are: Matthew B. Morton, Benjamin P. Powell and Nora Wilkins.

**3.** The registrar of Brunswick County is Ms. Barbara Lewis.

im court-ordered elections and stating that it would call a special election on as expedited a basis as possible once preclearance from the Justice Department was received. On January 29, 1992 the Justice Department precleared the July plan pursuant to 28 C.F.R. § 51.09(a). Accordingly, this Court scheduled a special election for April 7, 1992.

Prior to the April election, this Court conducted a three-day trial on the merits of plaintiffs' § 2 challenge to the July plan. Both parties filed post-trial briefs on their claims on April 16, 1992.

As a result of the April 7 election, an all-white board took office in Brunswick County.[4] During this election, three African American candidates, including two incumbents, lost head to head races with white opponents. Brunswick County has not had an all-white Board since 1974.

## III.

Brunswick is a predominantly rural county located in southside Virginia. Its southern border abuts the state of North Carolina, its eastern side runs along Greensville County in Virginia, and Mecklenberg and Lunenburg Counties lie to the west. According to the 1990 Census of the United States, excluding the population of the state prison within Brunswick County's boundaries, 15,085 people live in Brunswick County. Of that number, 8710, or 57.7 percent, are African American.

Prior to 1971, Brunswick County's supervisory election districts ran coterminous to its five magisterial districts: Meherrin, Powellton, Red Oak, Sturgeon and Totaro. Following the 1971 census, Brunswick reapportioned its districts to comport with the one-person one-vote requirement of the Fourteenth Amendment to the United States Constitution. As a result of this reapportionment process, Brunswick County's magisterial district lines were altered to contain the following population breakdowns:

| | Percent Black Population |
|---|---|
| District 1 (roughly equivalent to Meherrin) | 49.9 |
| District 2 (roughly equivalent to Powellton) | 66.2 |
| District 3 (roughly equivalent to Red Oak) | 54.7 |
| District 4 (roughly equivalent to Sturgeon) | 69.2 |
| District 5 (roughly equivalent to Totaro) | 51.5 |

Following the 1980 census, Brunswick County undertook another reapportionment process. On October 23, 1981, the Board approved a redistricting plan that modified the Meherrin and Powellton lines. When the Board discovered that this new plan relied upon inaccurate census data, it rescinded its approval and reverted to the 1971 district lines by vote on December 16, 1981. Thus, the previous 1971 plan involved the following 1980 population breakdowns:

| | Percent Black Population |
|---|---|
| District 1 | 50.7 |
| District 2 | 64.4 |
| District 3 | 55.0 |
| District 4 | 68.2 |
| District 5 | 48.9 |

In 1988, plaintiffs Charles White, James Smith, George Smith and the Brunswick County Chapter of the National Association for the Advancement of Colored People ("NAACP") filed suit against the Board of Supervisors, the Electoral Board and the Registrar of Brunswick County. At issue was a § 2 claim of vote dilution similar to that presently before this Court.

In that first case, this Court found that the plan diluted the votes of black residents of Brunswick County in violation of § 2 of the Voting Rights Act. The United States Court of Appeals for the Fourth Circuit invalidated that ruling, finding plaintiffs' claims barred by laches. The Supreme Court denied certiorari on the case. *See White v. Daniel*, No. 88–0568–R (E.D.Va. Aug. 31, 1989) *rev'd*, 909 F.2d 99 (4th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991).

---

**4.** The April 7 election results appear in Appendix A of this decision.

Following the 1990 census, the County reapportioned its district lines once again. The genesis of the current action lies in this third redistricting effort. At first, the County devised a plan with the following population breakdown:

| | % Black Pop. | % Black Voting Age Pop. |
|---|---|---|
| District 1 | 47.5 | 43.7 |
| District 2 | 64.4 | 61.3 |
| District 3 | 55.3 | 52.8 |
| District 4 | 63.6 | 61.4 |
| District 5 | 57.8 | 57.2 |

On April 22, 1991, the County held a public hearing on the proposed plan. No African American expressed support for the redistricting. The named plaintiffs in this action, the Brunswick County NAACP and the Brunswick County League for Progress, a once biracial (but now predominantly black) civic and political organization, openly voiced opposition to it.

The primary complaint regarding the proposed plan involved Census Block 9902 231 in District Five, commonly called the Totaro District. That block is comprised largely of students at St. Paul's College. While most of those students are of voting age, the majority do not vote in Brunswick County. Because St. Paul's student population is overwhelmingly African American, plaintiffs sought to excise the student population from the overall black voting percentages in District Five.

During this April hearing, representatives of the American Civil Liberties Union ("ACLU") presented a counterproposal. Under the ACLU plan, the District containing St. Paul's College would have an African American population of 72.2 percent in order to offset what the ACLU considered to be the dilutive effect of the nonvoting students. In July of 1991, plaintiff George

R. Smith delivered a second ACLU draft voting plan to defendants. Again, the Totaro district would have a 70 percent black majority percentage.

The County conducted a second public hearing on July 29, 1992.[5] The Board presented a revised proposed plan:

| | % Black Population |
|---|---|
| District 1 | 42.5 |
| District 2 | 67.5 |
| District 3 | 51.9 |
| District 4 | 64.1 |
| District 5 | 62.7 |

Despite existing objections, the Board approved this plan on July 31, 1991.

Under this plan, District Five includes the student population at St. Paul's College. Census Block 9902 231 has a total population of 373, and a total black population of 368, all of whom are of voting age. When the dormitories at St. Paul's College are excluded from District Five in the above configuration, the black voting-age population drops to 55.1 percent.

The evidence presented at trial overwhelmingly establishes that St. Paul's students do not vote in Brunswick County. Of the 500–plus full or part time pupils at St. Paul's, only 31 list Lawrenceville as their home address. Only three of these 31 claim St. Paul's College as their home address. Moreover, testimony indicated that those few students who attempt to register in Brunswick County confront obstacles against doing so because of their student status. The registrar of Brunswick County testified that a presumption exists that students at St. Paul's are not residents of the County.

In short, this Court finds that the inclusion of the student population at St. Paul's in the District Five voting age population figures grossly overstates the actual vot-

---

**5.** During the course of this litigation, this Court heard and disposed of a counterclaim and third-party suit. Defendants sought to prove that the parties had entered into a binding settlement agreement prior to this July 29 public hearing. On January 22, 1992, this Court held a full evidentiary hearing on the matter. By order dated January 31, this Court found that no evidence existed that a settlement agreement had been entered into. Accordingly, this Court dis-

missed defendants' counterclaim and third-party suit.

Defendants filed a motion to hold an appeal on this ruling in abeyance, which the United States Court of Appeals for the Fourth Circuit denied. The Fourth Circuit granted plaintiffs' motion to dismiss defendants' appeal. *See Smith v. Brunswick County,* No. 92–1251 (4th Cir., Mar. 30, 1992).

ing strength of eligible black voters in the district. When the student population is subtracted the black voting-age population is reduced to a level that assures that black voters will have no meaningful opportunity to select candidates of their choice. This result, in the context of other factors described below, leads to a clear violation of Section 2 of the Voting Rights Act.

## IV.

Historically, both Virginia and Brunswick County enforced laws that discriminated against African American residents. Brunswick County has a particularly long and sorry record in this regard. Black citizens of the County suffered the effects of this bias publicly and privately. Such discrimination included *de jure* and *de facto* sanctions of race-based denial of public accommodations, state requirements for segregation in schools and housing, and denial of equal access to the ballot.

In the past, Virginia erected a structure of discriminatory laws which fell only when federal courts banned such practices as unconstitutional. Until 1974, Virginia required proof of literacy in order to vote. *Virginia v. United States*, 386 F.Supp. 1319 (D.D.C.1974) (three judge panel), *aff'd*, 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 833, *reh'g. denied*, 420 U.S. 984, 95 S.Ct. 1416, 43 L.Ed.2d 666 (1975). Virginia imposed a poll tax through 1966. *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965). Until 1964, Virginia laws required separation of names by race on several state rolls, including voter registration, residence certificates and tax lists. *Griffin v. Board of Supervisors*, 339 F.2d 486 (4th Cir.1964); *Hamm v. Virginia State Board*, 230 F.Supp. 156 (E.D.Va. 1964), *aff'd sub nom., Tancil v. Woolls*, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91 (1964). Virginia laws banned integration in public places until 1963. *Brown v. City of Richmond*, 204 Va. 471, 132 S.E.2d 495 (1963). Finally, in 1967, the United States Supreme Court struck down the Commonwealth's miscegenation statute. *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

As did the state, Brunswick County built a system whose foundation was premised, in part, on excluding African American citizens from participating in it. In 1959, the Board of Supervisors passed a resolution opposing the hiring of white professors by St. Paul's College. The Board of Supervisors vehemently opposed school desegregation and busing. Until 1969, the Board approved private tuition grants for white parents so that their children could attend private school. Such grants often paid tuition to the all-white Brunswick Academy, a private school founded when federal law required school desegregation. More recently, in 1984 the principal of Sturgeon Elementary School (98 percent of whose students are black) wrote the parents of white children in his school promising them that all white children would be taught in the same classroom by a white teacher. The School Board privately reprimanded the principal and instructed the school superintendent to place a letter of disapproval in the principal's personnel file.

In fact, the County has an unfortunate history of intransigence to integration. In 1959, the town of Lawrenceville transferred the public pool and recreational facilities to an all-white private country club rather than face integration of these facilities. This club, now called Elms Acres, remains all-white to this day. In 1981, the Homemakers Club in Brunswick County disbanded when the United States Department of Agriculture ordered it to integrate. The segregated movie theater closed rather than opting to integrate. And in 1982, the Registrar of Brunswick County resigned rather than maintain longer office hours, as required by law, so that minority citizens had greater opportunities to sign up.

Segregation persists in nearly all aspects of the Brunswick County community. Not a single witness denied that churches, clubs and political organizations split along racial lines in Brunswick County. Groups once predominantly white, such as the Democratic party, lost their white membership once black members joined. Today, the Democratic party membership is virtually all black, the Republicans predominantly

are white. No evidence exists that any group in Brunswick County is anything other than nominally integrated.

This history of segregation and overt discrimination has lingering effects on the black community's ability to participate equally in public duties and opportunities. In 1988, only six of the 47 persons Brunswick County employed full time were black. During the 12 month period ending June 30, 1991, black workers comprised only one-quarter of the County work force, despite the fact that they constitute nearly 60 percent of the County's population.

The same disparity exists in County committees, commissions and boards. The majority of election officials are white. No African American has ever been appointed to the Board of Supervisors despite two recent openings. The School Board, which the Electoral Board appoints, has three black and four white members, despite the fact that the student population is overwhelmingly black. No African American served on the School Board prior to 1972 when, due to external pressure, two at-large seats for black citizens (of seven total) were created. Only one black individual has ever been appointed to represent an individual election district on the school board.

These disparities in election success may stem, in part, from underrepresentation of blacks in the electoral process itself. Polling places often are in white areas. Sturgeon District, a heavily black district, has only one polling location. Mr. Alvin Rice serves as the sole African American precinct captain in all Brunswick County. While names of black citizens appear on the polling lists, they rarely are called to serve as pollworkers on election day. In the November 1991 general election, a white election official, aiding a black voter who is blind, apparently would have cast a vote for the white candidate against his wishes, but for the intervention of the voter's relative.

Moreover, black candidates seeking election face an arduous struggle above and beyond normal campaign battles. The evidence strongly establishes that black candidates continue to encounter harassment, subtle and overt, when attempting to run for political office. In the 1991 election for Virginia State Senate from the 18th District, Ms. Louise Lucas, a black woman, was characterized as "a welfare bureaucrat" and "an inner-city resident" in her opponent's campaign literature. Her photograph appeared next to these depictions of her character.[6]

Finally, blacks experience lower educational, employment and economic levels than do white citizens of Brunswick County. The 1980 census indicates that 42 percent of whites were high school graduates while only 28.4 percent of blacks had high school diplomas. on average, whites have 2.6 more years of school completed than do blacks. There are no black lawyers, dentists, certified public accountants or doctors in Brunswick County. Moreover, black residents of Brunswick County experience unemployment at a rate three times higher than that of white residents. Per capita, blacks earn on average less than half the income of whites. Black families have a median income just two-thirds of that a white family earns. Finally, 5.6 percent of white housing units do not have bathroom facilities in Brunswick County. Almost six times that number of black houses, or 32.1 percent, lack bathroom facilities.

## V.

African American candidates running for public office in Brunswick County have seen sporadic success in elections since 1975.[7] However, no black candidate for a county office has ever won a county-

---

**6.** Ms. Lucas won this election. Among other things, the literature circulated by her opponent, Mr. Frank Ruff, increased name recognition for Ms. Lucas.

**7.** The ability to elect one or two representatives, or the appointment of one or two minority members to a board, does not preclude a voting rights action. *Collins, et. al. v. City of Norfolk, et al.,* 883 F.2d 1232, 1240 (4th Cir.1989). A Court need not be persuaded to "simply plac[e] a stamp of approval on token representation." *Id.* at 1240.

wide head-to-head contest against a white candidate, nor has a black candidate ever won a majority of the votes cast.

Supervisory elections were held in 1971, 1975, 1979, 1983 and 1987 under the 1971 plan detailed above. In 1975, Mr. H. Paul Harrison, a black candidate from District Two, was elected to the board.[8] Mr. Harrison won every subsequent election to the Board except the most recent April 7, 1992 election, when a white candidate defeated him. At the time he was voted out of office, Mr. Harrison served as Chair of the Board of Supervisors.

Mr. Walter Rice, Jr., a black candidate from District Four, also won his first election in 1975. Like Mr. Harrison, Mr. Rice won every contest until the April 7 race, in which he was defeated by a white opponent.

In at least eleven races other than those for the Board of Supervisors, black candidates have attempted to take county-wide seats. Only two candidates ran successfully, and in each instance the victor took a plurality in a field of at least three candidates. In 1988, Ms. Constance Kelly Rice defeated three white candidates for the position of Clerk of the Circuit Court of Brunswick County. Ms. Rice won with 31 percent of the votes cast. In 1991, however, Ms. Rice lost her reelection bid to her sole opponent, who was white.

In 1991, Mr. James Woodley, a black candidate, won the sheriff's election. He defeated one black opponent and three white candidates. Mr. Woodley did not receive a majority of the votes cast.

The only other African American candidate since Reconstruction to win a majority of votes in a county-wide general election was L. Douglas Wilder. In his 1985 bid for Lieutenant Governor, now-Governor Wilder received 59 percent of the votes cast in the Brunswick County. In 1989, however, Governor Wilder received only 47.3 percent of Brunswick County's votes in his pursuit of the Commonwealth's highest office.

## VI.

The § 5 preclearance issued by the Justice Department in January does not preclude a § 2 challenge by plaintiffs. The Voting Rights Act explicitly states that "[n]either an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object ... shall bar a subsequent action to enjoin enforcement of such qualification, prerequisites, standard, practice, or procedure." 42 U.S.C. § 1973c; *Morris v. Gressette*, 432 U.S. 491, 506–507, 97 S.Ct. 2411, 2421, 53 L.Ed.2d 506 (1977). While courts generally are to give "substantial deference" to the construction placed upon the Voting Rights Act by the Attorney General, the Supreme Court has stated unequivocally that:

> [T]he principle has its limits. Deference does not mean acquiescence. As in other contexts in which we defer to an administrative interpretation of a statute, we do so only if Congress has not expressed its intent with respect to the question, and then only if the administrative interpretation is reasonable.

*Presley v. Etowah County Comm'n*, —— U.S. ——, ——, 112 S.Ct. 820, 831, 117 L.Ed.2d 51 (1992) (citations omitted).

Accordingly, this Court proceeds with its § 2 analysis. In 1982, Congress substantially revised § 2 of the Voting Rights Act, adopting the "results test" established by some courts and explicitly renouncing any requirement that plaintiffs must prove discriminatory intent when pursuing a voting rights claim. The amended statute reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or

---

**8.** Mr. Eugene Bartley, who was defeated by a white opponent, ran for the Board of Supervisors in 1975 in District Three. Mr. Bartley, Mr. Harrison and Mr. Rice were the only three black candidates who ran for a seat on the Board in that year.

In 1979, three black candidates lost head-to-head contests. Mr. James Jones lost in District One, Mr. George Brooks lost in District Three and Mr. Harold Macklin lost in District Five.

In 1987, plaintiff George Smith lost a head-to-head contest in District Five.

abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the state or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

The Senate Judiciary Committee Majority Report ("Senate Report") accompanying the 1982 amendments set forth seven "typical factors" to be used as guideposts in determining whether or not a § 2 violation has occurred:

1. The extent of any historical or official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in that state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 417, 97th Cong., 2d Sess. 27, 28–29, reprinted in 1982 U.S.Code Cong. & Admin.News 177, 206–07 (footnotes omitted).[9]

The Report emphasizes, however, that these factors are neither comprehensive nor exclusive. *Thornburg v. Gingles,* 478 U.S. 30, 45, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986). In fact, the Senate Report specifically admonishes that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another." *Id.* (citing S.Rep. at 29).

In *Gingles,* the Supreme Court held that "the essence of a § 2 claim is that a certain electoral law, practice, or structure, interacts with social and historical conditions to

---

**9.** The Senate Report identified additional factors that courts may look to when considering a § 2 violation: First, "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group," and, second "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting or standard, practice or procedure is tenuous." *Thornburg v. Gingles,*

478 U.S. at 37, 106 S.Ct. at 2759 (citing S.Rep. at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206–207).

These criteria originated in a Fifth Circuit case, and, consequently, are often referred to as *"Zimmer* factors." *See Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973), *aff'd sub nom East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. at 2764–2765. Urging a "flexible, fact-intensive" examination and a "searching practical evaluation of the 'past and present reality,'" the Court, relying on the Senate report, established three baseline requirements for proof a § 2 violation. *Gingles*, 478 U.S. at 46, 50–51, 106 S.Ct. at 2764, 2766–2767.

First, a minority group must show that it is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. Second, the minority group must show that it is "politically cohesive." *Id.* at 51, 106 S.Ct. at 2766–2767. Finally, the minority group must demonstrate that the "white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Id.*

While the *Gingles* Court analyzed a multi-member district voting scheme, subsequent decisions have applied this analysis to the type of single-member district challenge presently before this Court. *See McGhee v. Granville County*, 860 F.2d 110, 117 (4th Cir.1988); *McDaniels v. Mehfoud*, 702 F.Supp. 588 (E.D.Va.1988); *Neal v. Coleburn*, 689 F.Supp. 1426 (E.D.Va. 1988).

### Geographical Compactness

This Court finds that the black population of Brunswick County is sufficiently large and geographically compact to constitute an effective voting majority in three election districts. The July plan provides for a straight majority in four districts, as does plaintiffs' "Plan A" proposed alternate districting structure (Plan A yields a super-majority of over 65 percent in three

districts). Plaintiffs' "Plan B" renders a black majority in three districts, all close to or above the 65 percent margin. While defendants contest plaintiffs' proposed figures, the compactness test examines the viability of geographically compact minority districts only. Since all seven districting plans considered by the Board of Supervisors since 1971 have involved at least three African American majority districts, the feasibility of such districts is without question. *See* Plfs.' Exh. 14.

### Political Cohesion and Racial Bloc Voting

The second and third *Gingles* requirements, as well as one of the Senate Report factors, focus on the existence of racially polarized voting. An examination of racial bloc voting can ascertain whether or not minority voters are politically cohesive,[10] as well as determining whether or not white bloc voting is solid enough to defeat the minority's preferred choice consistently. When making such an inquiry, a court must look only to "the difference between how majority votes and minority votes were cast," not the underlying rationale behind why the votes were cast as they were. *Gingles*, 478 U.S. at 73, 106 S.Ct. at 2778; *Collins v. City of Norfolk*, 816 F.2d 932, 935–936 (4th Cir.1987).

▮ Racially polarized voting can be established through both expert analysis and anecdotal evidence. *McDaniels v. Mehfoud*, 702 F.Supp. 588, 593 (E.D.Va.1988). While many lay witnesses supported his conclusions, this Court finds entirely persuasive the thorough analysis presented by Dr. Allan Lichtman regarding voting patterns in Brunswick County.

Dr. Lichtman testified that the concepts of political cohesion and racial bloc voting

---

10. Some courts look to common social, economic and political interests when analyzing a community's political cohesion. *See, e.g. Neal v. Coleburn*, 689 F.Supp. 1426, 1436 (E.D.Va.1988). Under this framework, African Americans in Brunswick County undeniably form a politically cohesive unit. The black community is politically active and ardently supports a local chapter of the NAACP. Through this and other organizations, including church groups, black citizens in Brunswick take strong positions on social and political issues in the county.

intertwine. In order to determine racial bloc voting, an analyst must first study the existence and degree of racially polarized voting. Racially polarized voting, in turn, consists of two components which are two sides of the same coin. The first is the cohesion of the voting of the black electorate, meaning to what degree black voters cast ballots for black candidates.[11] The flip side of the coin is the bloc voting of the white voters. This analysis entails looking at the extent to which whites voters "bloc vote" for candidates of their choice, and assessing whether or not this pattern, within a given jurisdiction, has the effect of minimizing the opportunities of minorities to participate in the system. Having studied racial bloc voting, an analyst must finally determine if the bloc voting is substantively or politically significant.

Dr. Lichtman utilized two techniques in preparing his study of Brunswick County voting patterns: (1) homogeneous precinct analysis, and (2) bivariate, two-equation ecological regression analysis. *See* Plfs.' Exhs. 73, 100. These techniques are well accepted among social scientists, and have been explicitly relied upon by the Supreme Court. *See Thornburg v. Gingles,* 478 U.S. 30, 52–54, 106 S.Ct. 2752, 2767–2768, 92 L.Ed.2d 25 (1986).

The homogeneous precinct analysis, which includes an extreme case inquiry, *compares the votes that black and white* candidates receive in predominantly black or white precincts. This method presents a descriptive study of voting patterns in Brunswick County. Over a 20 year period, Dr. Lichtman compared county-wide election results. First, Dr. Lichtman graphed the percentage of votes cast for the black candidate in each precinct relative to the percentage of blacks in that precinct. Virtually without exception, the black candidate received extremely low percentages in

predominately white precincts. Conversely, the graphs indicate that the black candidate secured exceedingly high levels of support in predominantly black precincts.

As a corollary to this analysis, Dr. Lichtman compared the votes received, over a period of time, by different African American candidates in each precinct. Dr. Lichtman found a significant correlation across elections. Such a relationship means that different black candidates in different elections receive the same level of support in each precinct. Dr. Lichtman's analysis demonstrates that since 1971, excluding the 1987 and 1988 elections for the extrinsic reasons described *supra,* black voters cast ballots for black candidates ranging from 72 to 97 percent of the time. Dr. Lichtman testified that such numbers establish a pattern one might expect from a racially polarized voting district.

Dr. Lichtman's second set of studies looked to racial polarization and, within it, political cohesion. Using an ecological regression, or inferential, analysis of voting patterns in Brunswick County between 1971 and 1991, Dr. Lichtman estimated the percentage of blacks and whites voting for black and white candidates in each election. He ultimately concluded that, on average, white voters voted for the white candidate 98 percent of the time. Only 2 percent of the white voters voted for a black candidate in any particular election. At trial, Dr. Lichtman testified that such racial bloc voting was "extraordinary" and "at the mathematical maximum."

Conversely, approximately 80 percent of black voters cast ballots for black candidates. Dr. Lichtman found that in 17 of the 19 elections he studied, a landslide majority of black voters, or over 60 percent, cast ballots for a black candidate. When excluding the 1988 Clerk and Senate

---

11. This Court finds persuasive Dr. Lichtman's use of a 60 percent figure for a cohesion rate. Dr. Lichtman testified that a mere majority might indicate cohesion. However, this Court finds that the more stringent 60 percent figure, which is generally regarded as evident of a landslide victory in American political history as well as suggestive of a "non-competitive" situation by political historians, is the more appropriate benchmark.

races,[12] the number jumps to 80 percent politically cohesive voting on the part of African American voters in Brunswick County. Since 100 percent cohesion among the black electorate is virtually unheard of, Dr. Lichtman found such political cohesion among black voters significant. Characterizing these patterns as "differential polarization," Dr. Lichtman convincingly demonstrated that despite the overwhelming amount of support black residents of Brunswick County give to black candidates, they are essentially blocked from any significant electoral success by the monolithic wall of votes cast by white voters for white candidates.

Dr. Lichtman, using data from elections between 1971 and 1991, estimated that the minimum black population necessary in any Brunswick County voting district to create an *equal opportunity* for a black candidate to win would be 65 percent. A so-called "safe" district, Dr. Lichtman testified, would require an even greater proportion of black voters. Alternatively, Dr. Lichtman surmised that a district in which 55 percent of its members were black would not result in a black candidate receiving sufficient votes cast to constitute a majority. This analysis is born out by the actual facts in Brunswick County. District Three, which under all plans since 1971 has had more than 50 percent in black population, has never elected a black to the Board of Supervisors.

In contravention to Dr. Lichtman's analysis, the defendants offered testimony by Mr. Kimball Brace, founding president of Election Data Services, Inc., a research and political consulting firm in Falls Church, Virginia. Trained as a political scientist, Mr. Brace acknowledged that he is neither a statistician nor an expert in ecological regression analysis. Mr. Brace stated at trial that voting in Brunswick County is racially polarized. However, explicating data prepared by a member of his firm named Dr. Lisa Handley, Mr. Brace testified that the primary factor regarding black citizens' ability to elect candidates of their choice is voter turnout levels.

Flaws in his methodology became evident during Mr. Brace's testimony. First, Mr. Brace (through Dr. Handley's analysis) relied upon county-wide, not district by district, turnout figures. As such, individual concerns, such as possible lower voter turnout in District Five because of student voters, went unaddressed. Second, evidence presented by plaintiffs called into question the accuracy of the single-equation methodology used by Dr. Handley.[13] The evidence shows that defendants relied on data in which the "r" and "r²" factors had low levels of correlation, meaning that statistically, the information was insignificant. *See* Plfs'. Exh. 95. Moreover, Mr. Brace and Dr. Handley have co-authored scholarly works in which they advocate a technique weighing many variables when analyzing voting data, avoiding reliance upon any one variable, such as voter turnout, too heavily in analyzing voting patterns. *See, e.g.,* Brace, Grofman, Handley and Niemi, *"Minority Voting Equality: the 65 Percent Rule in Theory and Practice,* 10 Law & Policy 43, 44, 46 (1988). Finally, plaintiffs' Rebuttal exhibits 1–6 indicate that defendants' estimates regarding nine elections in 1987–1991 overestimated the vote for black candidates in all but one race, and in some instances did so by over 20 percentage points.

As already stated, Dr. Lichtman's analysis persuades this Court. First, while this Court does not place great emphasis on the

---

**12.** Two elections in 1988 did not strictly follow the pattern of racial bloc voting. In the Senate race, the white Democratic candidate, Charles S. Robb, received support from both black and white voters. The black Republican, Maurice Dawkins, did not receive a large proportion of black Brunswick County voters' votes. Evidence showed that other factors may have influenced this race. Among them is the fact that the Democratic party in Brunswick County is nearly all black.

In the county race for Clerk, a sole black candidate, Constance Kelly Rice, took 31 per-

cent of the vote. However, the white vote split among three aspirants to office. As noted above, Ms. Rice took a plurality among three candidates.

**13.** Despite Mr. Brace's attempt to refute Dr. Lichtman's technique, evidence showed that in May of 1991, Dr. Handley used the identical method of analysis, under Election Data Services letterhead, when preparing a study for the Texas Legislature Council on Proposed Senate District 15. Transcript, pp. 670–673.

results of the April 7, 1992 special election because it occurred under unusual circumstances,[14] this Court does recognize that Dr. Lichtman's predictions were far closer to the outcome than those estimated by defendants' experts. Dr. Lichtman stated at trial that the 55 percent majority would not result in a black majority vote. In the Totaro District, the black candidate received only 39 percent of the vote.

Moreover, this Court finds defendants' mantra regarding high levels of black voter turnout unpersuasive for other reasons. Most important, the Fourth Circuit has expressly held that increased black voter registration and turnout should not be viewed "as inordinately important" because such information is "probative, but not dispositive." *Collins v. City of Norfolk*, 816 F.2d at 939. Also, the April 1992 election, admittedly held under unusual circumstances, departs from the pattern defendants seek to invoke. *See* Supp.Aff. of A. Lichtman. Finally, defendants insist that this pattern counteracts any substantial levels of white bloc voting in Brunswick County. But the evidence establishes that a turnout only as fully monolithic as that of white voters could level the playing field for black voters.

### VII.

■ Congress intended the Voting Rights Act to aid in equalizing opportunities for all citizens to elect their preferred candidates and to participate in the electoral process. As drafted, the July plan adopted by the Brunswick County Board of Supervisors unfairly dilutes minority voting strength in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973. This Court reaches this conclusion cognizant of, and in spite of, the substantial deference due to the July plan following the Justice Department's preclearance of it.

In support of this decision, this Court relies on Dr. Lichtman's analysis establishing that black candidates in head-to-head contests with white aspirants consistently lose when their voting age population comprises less than 60 percent of the total in the District.

This Court also looks to other considerations in the Senate Report when reaching this outcome. The County has a history of discrimination directly affecting the right to register and vote, which has yielded only reluctantly over the years and still requires constant pressure from black citizens to approach operating fairly. Discrimination in appointments to boards directly impinges on the ability of African American citizens to participate in the political process. Black citizens are grossly underrepresented in County jobs. In fact, blacks in Brunswick County bear the lingering effects of this discrimination by experiencing lower education levels, poorer housing and lesser earning power. This Court finds that these conditions dramatically hinder the ability of African Americans to participate fully in the political process in Brunswick County.

Accordingly, under the totality of the circumstances and weighing the substantial deference due to the Justice Department's preclearance, this Court holds that the current system for election to the Brunswick County Board of Supervisors interacts with past and present official discrimination and social conditions to deprive black citizens of Brunswick County the equal opportunity to participate in the political system and to elect representatives of their choice.

This Court also appreciates the consequence of ruling otherwise. By asking this Court to ignore the totality of the circumstances in Brunswick County, defendants

---

**14.** In *Thornburg v. Gingles,* the Supreme Court warned against relying too heavily upon data from a single election. *See Thornburg v. Gingles,* 478 U.S. 30, 57, 106 S.Ct. 2752, 2769, 92 L.Ed.2d 25 (1986) ("Because loss of political power through vote dilution is distinct from the mere inability to win a particular election … a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election.") In *Collins v. City of Norfolk, Va.,* the Fourth Circuit considered the special circumstances created when an election was held during the pendency of a voting rights claim. *Collins v. City of Norfolk, Va.,* 883 F.2d 1232, 1241–42 (4th Cir.1989).

ask it to, in effect, penalize black citizens for voting color blind 20 percent of the time. Concomitantly, a decision keeping the current system intact would send a message to white voters that if they could maintain their monolithic race-related voting patterns, they could be assured a white victor in three of the five districts in Brunswick County. Without hesitation, this Court determines that such an outcome contradicts the intent of the Voting Rights Act.

This Court concludes with one final point. Defendants repeatedly assert that plaintiffs in this action seek proportional representation. This Court wishes to make crystal clear that a right to proportional representation has not entered its reasoning in any manner. This decision firmly rests, as painstakingly detailed above, on the uncontrovertible existence of racially polarized voting in Brunswick County, an extreme degree of monolithic voting by whites for white candidates, ongoing official discrimination in the County which directly affects the right to vote and to participate in the political process, and tragic lingering effects of discrimination in education, employment and economic welfare which continue to hinder the black citizens' ability to participate effectively in the political process.

Since this Court rests its determination on statutory grounds, it will not reach the Constitutional concerns. *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936); *Escambia County v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 1578, 80 L.Ed.2d 36 (1984). Accordingly, defendants' motion at trial to dismiss the plaintiffs' constitutional claims is DENIED as MOOT.

Finally, on May 12 plaintiffs filed a motion to supplement the record with an affidavit of Dr. Allan Lichtman regarding the May 5, 1992 special election for seats on the Town Council of Lawrenceville. Upon due consideration, this Court DENIES plaintiffs' motion to supplement the record.

## VIII.

Congress has stated that when a Court finds that voting rights have been violated, it "should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice." S.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), U.S.Code Cong. & Admin.News 1982, p. 208.

In accordance with this admonition, this Court gives the defendants the opportunity to devise an acceptable remedial plan in the case at bar. *See McGhee v. Granville County*, 860 F.2d 110, 115 (4th Cir.1988) (citing *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973)); *McDaniels v. Mehfoud*, 702 F.Supp. 588, 596 (E.D.Va.1988). Once defendants present the proposed remedial plan to this Court, it will judge the new plan under the same standards applicable to an original challenge of the legislative scheme. *McGhee*, 860 F.2d at 115 (citations omitted).

However, this Court does not wish to prolong this case beyond that time in which a fair plan may be devised. Accordingly, this Court hereby DIRECTS defendants to submit a proposed remedial plan within three (3) weeks of the date of this Order, after which this Court will give the plaintiffs two (2) weeks to comment on the proposed plan.

After such submissions, this Court will rule rapidly on the sufficiency of the defendants' proposed plan, taking into consideration the alternatives plaintiffs have entered into the record. The Court will adopt and implement a remedial plan. A new election will be ordered under the new plan. The Court will outline the time schedules for candidate qualification, campaigning and election after a plan has been selected.

And it is SO ORDERED.

## APPENDIX A
### April 7, 1992 Special Election Results
### Board of Supervisors
### Brunswick County, Virginia

| District One | Votes Rec'd | % Votes Cast |
|---|---|---|
| **Meherrin** | | |
| Registered Voters | | |
| **Robert H. Conner (W)** | 368 | 63.5 % |
| Don E. Dugger (W) | 212 | 36.5 % |
| | | |
| **District Two** | | |
| **Powellton** | | |
| Registered Voters | | |
| *H. Paul Harrison (B) | 467 | 49.4 % |
| **Leroy Lynch (W)** | 478 | 50.6 % |
| | | |
| **District Three** | | |
| **Red Oak** | | |
| Registered Voters | | |
| *Raymond S. Daniel (W) | 228 | 100 % |
| | | |
| **District Four** | | |
| **Sturgeon** | | |
| Registered Voters | | |
| **James Pritchett (W)** | 517 | 63.6 % |
| *Walter Rice (B) | 296 | 36.4 % |
| | | |
| **District Five** | | |
| **Lawrenceville** | | |
| Registered Voters | | |
| **Howard Settle (W)** | 581 | 61.4 % |
| George R. Smith (B) | 366 | 38.6 % |

*Incumbent.