984 F.2d 1393
 George R. SMITH; Charles White; James A. Smith, Jr.,
Plaintiffs-Appellees,
v.
BRUNSWICK COUNTY, VIRGINIA, BOARD OF SUPERVISORS; Raymond
S. Daniel; Thomas B. Taylor; Walter Rice, Jr.; Marion W.
Peebles; H. Paul Harrison, in their official capacities as
members of the Board of Supervisors of Brunswick County;
the Electoral Board of Brunswick County, Virginia; Mathew
B. Morton; Benjamin P. Powell; Nora Wilkins, in their
official capacities as members of the Electoral Board of
Brunswick County; Registrar of Brunswick County; Barbara
Lewis, in her official capacity as Registrar of Brunswick
County, Defendants-Appellants.
v.
AMERICAN CIVIL LIBERTIES UNION, OF VIRGINIA; ACLU
Foundation of Virginia, Third Party Defendants-Appellees,
and
National Association for the Advancement of Colored People,
Brunswick County, Virginia, Branch, Third Party Defendant.
 No. 92-1978.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 1, 1992.
Decided Feb. 1, 1993.
 
 Lewis Franklin Powell, III, Anne Gordon Greever, Hunton & Williams, Richmond, VA, argued (R. Hewitt Pate, Hunton & Williams, on brief), for defendants-appellants.
 Moffatt Laughlin McDonald, American Civil Liberties Union Foundation, Atlanta, GA, argued (Neil Bradley, American Civil Liberties Union Foundation, Atlanta, GA, Stephen B. Pershing, American Civil Liberties Union Foundation of Virginia, Richmond, VA, on brief), for plaintiffs-appellees.
 Before HALL, NIEMEYER, and WILLIAMS, Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 On April 7, 1992, Brunswick County, Virginia, conducted a special election to elect five members to its governing Board of Supervisors, one from each election district in the County. The election was conducted in accordance with a redistricting plan adopted by the County in July 1991 in response to the 1990 census. Although 58% of the people in Brunswick County are black, as are a majority of those eligible to vote in four of the five election districts, the people elected five white Board members.
 
 
 2
 Before the election, three black voters, the NAACP, and the ACLU filed this suit challenging the County's redistricting plan. They contended that the plan violated the Voting Rights Act of 1965 and the Fifteenth Amendment to the United States Constitution. Following trial, the district court concluded that the County's July 1991 plan "unfairly diluted minority voting strength" in violation of § 2 of the Voting Rights Act because the plan did not take into account statistical evidence that 20% of the County's black voters traditionally crossed over and voted with a monolithic white voting bloc. 801 F.Supp. 1513 (E.D.Va.1992). Having decided the case on statutory grounds, the court did not reach the constitutional issue. It vacated the County's redistricting plan, approved a new plan that provided greater black majorities in three districts, and ordered a new election.
 
 
 3
 On appeal, the County contends that the district court erred by attempting to guarantee the outcome of County supervisor elections in Brunswick County and by failing to recognize the limitations of the Voting Rights Act, which guarantees only the equal opportunity to vote and the right to have one's vote fully counted. The County also contends that its 1991 plan was the product of a settlement agreement with the plaintiffs that should be enforced, or, at least, that discovery should be permitted on the issue as a prerequisite to any factual finding.
 
 
 4
 Because we believe the district court erred in rejecting the County's 1991 redistricting plan, we reverse and remand.
 
 
 5
 * Brunswick County, Virginia, with a population of approximately 15,000, is a rural county in southeastern Virginia, located on the Virginia-North Carolina border. The County is divided into five geographical election districts, each of which elects a member to the County's governing Board of Supervisors. Elections are held every four years, with the last regular election taking place in November 1987. The election scheduled for November 1991 was stayed as a result of this litigation, and a special election was conducted on April 7, 1992.
 
 
 6
 Before 1971, Brunswick County's supervisor election districts followed the geographical boundaries of the County's magisterial districts. The County readjusted its election district lines in 1971, however, to comply with court rulings mandating one-person/one-vote. Although the 1980 census revealed some population shifts, the County retained these same lines, without any objection.[1] The population and racial composition of each district in 1971 and 1981 were:
 
 
 7
 Since the 1970 census, five regularly scheduled elections for the Board of Supervisors were conducted, in November of 1971, 1975, 1979, 1983, and 1987. In addition, there have been two special elections, one in 1982 to fill a vacancy in District 5 created by a Board member's resignation and one on April 7, 1992, as ordered by the district court in this case. In each of the elections of 1975, 1979, 1983, and 1987, two black candidates were elected to the Board, H. Paul Harrison in District 2 and Walter Rice, Jr., in District 4. These two supervisors ultimately became the Board's senior members, and Harrison became its chairman.
 
 
 8
 The evidence at trial showed that throughout the period beginning in 1970 black voters have been actively involved in the election process in Brunswick County. Black candidates for the Board of Supervisors have been fielded in most of the district elections and, up to the time of trial, black voter turnout had consistently exceeded white voter turnout by 10 to 20%. When all elections in Brunswick County are considered, the success achieved by black candidates has varied, ranging from the more than 80% of the vote received by Jesse Jackson, the black Presidential candidate in the 1988 Democratic primary, to the 7% received by Charles White, a plaintiff in this case and a black candidate, in the county-wide sheriff's election in 1991. A black candidate for the United States Senate in the general election of 1988 received only 23%, while Governor L. Douglas Wilder, also black, received 59% and 56% of the vote in the County's general elections in 1985 and 1989, respectively. In Board elections, the variations in support of black candidates has also been significant. Harrison, a long-term Board member, has won elections by over 60% of the vote in his district, while other black candidates have lost by margins greater than those of Harrison's victories. Other races between black and white candidates have been decided by only a handful of votes. Of the 14 Board contests in which black candidates ran, a black won in eight.
 
 
 9
 Although blacks have participated actively and significantly in supervisor elections since 1970, both as candidates and as voters, racial polarization persists in Brunswick County. The district court found that racial integration in the County has been slow, at best:
 
 
 10
 Historically, both Virginia and Brunswick County enforced laws that discriminated against African American residents. Brunswick County has a particularly long and sorry record in this regard. Black citizens of the County suffered the effects of this bias publicly and privately. Such discrimination included de jure and de facto sanctions of race-based denial of public accommodations, state requirements for segregation in schools and housing, and denial of equal access to the ballot.
 
 
 11
 Smith v. Board of Supervisors, 801 F.Supp. 1513, 1517 (E.D.Va.1992). The court also found that "[s]egregation persists in nearly all aspects of the Brunswick County community. Not a single witness denied that churches, clubs and political organizations split along racial lines in Brunswick County ... [and] [t]he same disparity exists in County committees, commissions and boards." Id. at 1517-18. The court accepted the conclusion of Dr. Alan Lichtman, an expert who testified on behalf of the plaintiffs, that despite the active and substantial participation of blacks in the election process, they have not been sufficiently successful because "they are essentially blocked from any significant electoral success by the monolithic wall of votes cast by the white voters for white candidates." Id. at 1523. Dr. Lichtman gave his opinion that the minimum black population necessary in any Brunswick County voting district "to create an equal opportunity for a black candidate to win would be 65 percent." Id.
 
 
 12
 When the 1990 census figures were released in the spring of 1991, the Board of Supervisors retained an accounting and consulting firm to prepare a draft redistricting plan, and in April 1991 conducted a public hearing on a proposed redistricting plan, which it had published in the local newspaper. Three individuals who were plaintiffs in earlier litigation challenging Brunswick County districts,[2] the National Association for the Advancement of Colored People (NAACP), and the American Civil Liberties Union (ACLU) voiced opposition to the proposed plan and threatened to sue the Board if the plan were adopted in the form published. To avoid litigation, the Board entered into negotiations with Stephen B. Pershing, of the ACLU Foundation of Virginia, and Gerald T. Zerkin, a lawyer with the private Richmond firm of Gerald T. Zerkin & Associates, who had been retained to represent the objecting parties. During the protracted negotiations that followed, Zerkin stated that any plan, to be acceptable, would have to include three districts with black populations of 60% or more. Following negotiations, the parties orally agreed to a plan that included three districts with black majorities of 67.5%, 64.2%, and 62.5%. Statements were accordingly obtained from the Brunswick Chapter of the NAACP and the Virginia Chapter of the ACLU that they would not oppose the plan. The ACLU's written agreement "not to oppose," transmitted to the County by Zerkin, had the signatures of the ACLU Executive Director, R. Kent Willis, and Pershing. Zerkin added, in an accompanying letter:
 
 
 13
 I can add that, should the press contact me for a statement, I would say that I did not object to the plan, because, in my opinion, it complied with all applicable laws, even though it was not the best possible plan for minority voters. I would also add that I believed acceptance of the plan was in the best interests of minority voters in the County, because it is lawful, it does provide meaningful opportunity for minority voters in three districts, and it is in the best interests of all citizens of the County to avoid additional litigation over this issue.
 
 
 14
 The County's Board of Supervisors orally agreed to the proposal, and when the Board's agreement was communicated by telephone back to Zerkin, he agreed to minor changes to certain boundary lines--adding nine white citizens to District 4, subtracting nine citizens from District 5, and adding nine white citizens to one location in District 3 while subtracting nine white citizens from a different location within the same district. Following the conversation, Zerkin filed a pleading on behalf of the ACLU in the case pending in the Supreme Court, see footnote 1, supra, stating that the litigation had become "moot" because the parties had "agreed in principle" to a new reapportionment plan for Brunswick County. The statement continued,
 
 
 15
 Additionally the new plan is favorable to petitioners and African-American residents of Brunswick County to the extent that a further challenge would not likely be available at all. There remain[ ] only minor changes to agreed upon district lines, formal approval by the Board of Supervisors and written confirmation of concurrence by petitioners.
 
 
 16
 On July 8, 1991, several weeks later, Zerkin wrote to counsel for the County, "My clients have determined that, because of the distortive effect of St. Paul's College on the black total population and VAP [voting age population] in proposed Totaro District [District 5], they cannot support the compromise plan."[3] Zerkin added, "Because of the awkward situation in which this places me, I am withdrawing from any further representation of these clients in connection with possible further discussions." Notwithstanding Zerkin's July 8 letter, the Board of Supervisors proceeded to adopt the compromise plan on July 31, 1991, by a unanimous vote. This plan created three districts, of the total five, in which both black population and black voting age population exceeded 60%. Blacks constituted an absolute majority in four of the five newly drawn districts. Pursuant to § 5 of the Voting Rights Act, the plan was submitted to the Department of Justice for pre-clearance. The plan was approved, and the district court scheduled a special election, held on April 7, 1992. Five white candidates were elected to the Board. In the three districts in which black candidates ran, the black candidates lost: in District 2 by 11 votes; in District 4 by 221 votes; and in District 5 by 215 votes.
 
 
 17
 The instant suit was filed by the ACLU on behalf of three plaintiffs, George R. Smith, Jr., Charles White, and James Smith, on October 19, 1991, after the efforts to settle had failed and several months before the special election. The Brunswick County Chapter of the NAACP did not join. Pershing and his associate from the ACLU continued to represent the plaintiffs. In late March 1992, shortly before the election on April 7, the district court conducted a 3-day trial and, following the election, issued findings of fact and conclusions of law. Relying extensively on the expert testimony of Dr. Alan Lichtman, the court determined that the plan violated § 2 of the Voting Rights Act. It based this determination on evidence that whites voted in a monolithic bloc and 20% of the blacks crossed over to vote with the whites, purportedly causing a dilution of the vote of the remaining blacks. The court accepted Dr. Lichtman's opinion that "white voters voted for the white candidate 98% of the time" and that "approximately 80% of the black voters cast ballots for black candidates." The district court concluded:
 
 
 18
 Dr. Lichtman convincingly demonstrated that despite the overwhelming amount of support black residents of Brunswick County give to black candidates, they are essentially blocked from any significant electoral success by the monolithic wall of votes cast by white voters for white candidates.
 
 
 19
 801 F.Supp. at 1523. Upon rejecting the County's plan, the court directed the submission by the County of two further plans. The first supplemental plan was rejected by an order dated July 30, 1992, and the second approved by an order dated August 10, 1992. The racial composition of the districts over the three plans are as follows:
 
 
 20
 Total Population"Percent Black
 Plan of Plan of Plan of
 July 1991[4] July 1992 Aug. 1992
 (rejected) (rejected) (approved)
Dist. 1 42.5 43.74 41.66
Dist. 2 67.5 63.73 63.91
Dist. 3 51.9 51.42 50.73
Dist. 4 64.1 64.06 64.06
Dist. 5[5] 62.7 65.18 68.12
------------- --------------- ---------- ----------
Total 57.7 57.74 57.74
 
 
 21
 The district court then ordered a second special election, using the approved plan, to take place on November 3, 1992. Pending our review on appeal, we stayed the operation of that order.
 
 II
 
 22
 We are presented here with a redistricting plan, developed in cooperation with the plaintiffs, the NAACP, and the ACLU, that represents a considered effort by Brunswick County to respond to the 1990 census and the requirements of the Voting Rights Act of 1965. We therefore must defer to the legislative will on the particular approach to compliance selected from a myriad of possibilities, limiting our role to the determination of whether the plan satisfies the requirements of the Act. See McGhee v. Granville County Bd. of Comm'rs, 860 F.2d 110, 115 (4th Cir.1988).
 
 
 23
 Rooted in the Fourteenth and Fifteenth Amendments, the Voting Rights Act of 1965 provides in pertinent part:
 
 
 24
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [because the citizen is a member of a language minority group], as provided in subsection (b) of this section.
 
 
 25
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 26
 42 U.S.C. § 1973. The Act thus ensures citizens of voting age a right to vote, regardless of their race, color, or language. Although voter empowerment encompasses the right to have free and equal access to the ballot box and to have the vote that is cast count the same as any other person's, it does not endow the voter with the right to have his or her vote cast for the winner. See 42 U.S.C. § 1973(b). That the outcome of an election runs contrary to the way a particular voter voted does not establish, in our system of majoritarianism, a lack of that voter's power. The voter is enfranchised by having voted and by having his or her vote counted, without any diluting device, as any other vote in the final tally that determines the outcome. While a vote must have equal weight, it is not, even if cast by a member of the protected class, entitled to have greater weight than any other vote.
 
 
 27
 Before the 1982 amendment to the Act, a debate developed over whether Congress intended to require discriminatory intent as an element of a violation of the Voting Rights Act. Some argued that § 2 of the Voting Rights Act not only implemented the Fifteenth Amendment and the requirement of intent embraced therein, but also reached further to protect against discriminatory results or effect, whether or not an intent to discriminate could be shown. See S.Rep. No. 417, 97th Cong., 2d Sess. 15-27, reprinted in 1982 U.S.C.C.A.N. 177, 192-204. The Supreme Court, in Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), held, however, that because the Voting Rights Act implemented and tracked the Fifteenth Amendment, to prove a violation of § 2 of the Act, a plaintiff had to prove discriminatory intent. Congress responded by expressly rejecting the "intent test" used in Bolden and amended § 2 to provide that the Act protects against discriminatory purpose and effect, and that discriminatory intent is not a necessary element. In amending § 2, Congress specifically intended to codify the "results tests" employed earlier in cases such as White v. Register, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc), aff'd on other grounds sub. nom, East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). S.Rep. No. 417 at 27-30, reprinted in 1982 U.S.C.C.A.N. at 204-08.
 
 
 28
 Section 2 of the Act, as amended, was first construed by the Supreme Court in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), where the Court examined a claim that the Act was violated when a redistricting plan diluted minority voting strength by "submerging" minority votes in a white majority through the use of multi-member, rather than single-member, districts. The Court recognized that a multi-member districting scheme might serve to impair the voting strength of racial minorities in the voting population, noting that: "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat choices of minority voters." Id. at 48, 106 S.Ct. at 2765 (emphasis added). The Court pointed out that multi-member redistricting is not per se a violation of minority voters' rights, however, and it imposed on plaintiffs the obligation of proving "that the use of a multi-member electoral structure operates to minimize or cancel out their ability to elect their preferred candidates." Id. If, for example, the protected voting class were politically cohesive and geographically compact and a single-member district with a majority of protected voters could be created, a multi-member system combined with white bloc-voting which submerged this group would violate § 2. If on the other hand, no such majority single-member district would be feasible, then the protected class could never argue that a multi-member configuration denied its members an equal opportunity to vote. Id. at 50-51 & n. 17, 106 S.Ct. at 2766-67 & n. 17. Recognizing that racial minorities can be denied their legal rights by white bloc-voting in multi-member districts, the Court consistently assumed that white-bloc voting could never be presumed to defeat a black majority in a single-member district. See id. at 48, 106 S.Ct. at 2765; see also McGhee, 860 F.2d at 116.
 
 
 29
 The seminal decisions in Gingles, White, and Whitcomb addressed vote dilution claims that can arise in the context of multi-member districts or at-large constituencies. Gingles held only that the group voting power of a racial minority, which in a single-member district would constitute a majority, could not be diluted by multi-member districting or at-large electorial processes which "submerge" the minority in the "bloc-voting" of a majority. Similarly in Whitcomb, while recognizing that multi-member districts have certain undesirable features which subject such a scheme to constitutional scrutiny, the Court nevertheless concluded that such districts are not per se illegal and are subject to constitutional challenge only where they " 'operate to minimize or cancel out the voting strength of racial or political elements of the voting population.' " 403 U.S. at 143, 91 S.Ct. at 1869 (quoting Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965)). The underlying theme of all these cases is that the vote dilution caused by multi-member districting is resolved by utilizing the more direct representation of single-member districts. See, e.g., Whitcomb, 403 U.S. at 140-44, 91 S.Ct. at 1867-70.
 
 
 30
 The model of vote dilution presented in Gingles--submerging the group vote of the protected class under the bloc-vote of the majority through a multi-member district when the protected class would otherwise constitute a majority in a single-member district--can also occur in a multi-district county, as exists in this case. Voters of the protected class, if they constitute a minority, could be spread throughout the several election districts of a county so that they constitute a voting majority in none. Even if they constitute the majority of the county's population, the voters of the protected class could be concentrated in one district, leaving them with a minority position in the others. The invidiousness of either districting scheme is further aggravated by majority bloc-voting. To measure whether either of these models of vote dilution exists in a multi-district county, a benchmark must be selected. But that mark cannot be the presence of black members in the relevant governing body. See 42 U.S.C. § 1973(b); McGhee, 860 F.2d at 118. Rather, the analysis must consider whether the protected voting group has a voting opportunity that relates favorably to the group's population in the jurisdiction for which the election is being held. See City of Richmond v. United States, 422 U.S. 358, 371, 375, 95 S.Ct. 2296, 2304, 2306, 45 L.Ed.2d 245 (1975).
 
 
 31
 In this case the plaintiffs have developed a novel theory that rests on a subdivision of the voting group protected by the Act. Because plaintiffs believe the data demonstrates that whites in Brunswick County vote monolithically and that 20% of the blacks cross over and join the whites, the plaintiffs treat the two groups (the monolithic white voters and the 20% cross-over black voters) as one majority which regularly defeats the remaining 80% of the black-voting group.[6] In essence, they divide the protected class, i.e. the black voter group, into two, ignoring the cross-over group and focusing on the 80%-majority black group. The effect is to accord disproportionately little weight (or no weight at all) to the votes of the nonconforming 20% of black voters, while overweighing the votes of the remaining 80%.
 
 
 32
 Although the theory may have some inherent logic if election outcomes are the goal, it finds no support in the law. To divide the protected group into parts depending on how its members vote violates both the letter and spirit of the Voting Rights Act by resolving discrimination issues on the basis of whether members of the protected group are elected. The proviso added in 1982 to the Act, that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population," was intended to assure that the focus be directed to giving the protected voting group the opportunity to vote and have their votes count and not to giving the protected group a right to have representatives "elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). The Act recognizes that representation is determined by the will of the voters which may, or may not, reflect the group's race, color, or language. If we were to attempt to assure that the 80% bloc of black voters could elect blacks, we would have to dilute the remaining 20% of the black voter group as well as the white voter group, effecting the very discrimination that the Act intended to prohibit.
 
 
 33
 When protected voters have equal access to the polls, when they are free of undue influence in voting, and when they represent the majority in a majority of the political unit's voting districts, they can claim no further rights from the Fifteenth Amendment and the Voting Rights Act. Cf. Washington v. Tensas Parish Sch. Bd., 819 F.2d 609, 612 (5th Cir.1987). In this case the record shows that black voters represent a majority in four of the five districts, that black voters represent a majority of over 60% in three of the five districts, and that black voters actually go to the polls in proportionately greater numbers than white voters, by 10 to 20%.[7] That the black voters did not elect blacks, we conclude, is the will of the voters and not the result of an illegal discriminatory voting process.
 
 
 34
 It is troubling for a court to be considering an approach based on monolithic or bloc voting by whites and blacks. Apart from assuming voter ill-will or racism on so large a scale, the analysis unfortunately suggests that the voters' will should be manipulated, regulated, or countered by structural devices imposed by the courts. The constitutional structure of our government attempts to fracture the unwelcome distortions that can occur in a system of majoritarianism. But the power inherent in the voter's free exercise of his or her vote must, nevertheless, carry with it the possibility of a faction furthering an interest motivated by passion or self-interest, contrary to the aggregate interests of the community. James Madison appropriately wrote:
 
 
 35
 Liberty is to faction, what air is to fire, an aliment without which it instantly expires. But it could not be less folly to abolish liberty, which is essential to political life, because it nourishes faction, than it would be to wish the annihilation of air, which is essential to animal life, because it imparts to fire its destructive agency.
 
 
 36
 The Federalist No. 10, at 44 (James Madison) (G.W. Carey & J. McClellan ed., 1990). We can only urge that the people of Brunswick County, with the freedom to vote guaranteed them by the Constitution, the Voting Rights Act, and this opinion, exercise it in a manner that furthers the interests of good government, by whomever it is provided.
 
 
 37
 We suspect that the district court was influenced by a well-justified concern that the Board of Supervisors in Brunswick County should have a more proportionate representation, particularly in view of the results of the special election on April 7, 1992, in which the County elected five white members. The suspicion is fortified by the district court's heavy reliance on Dr. Lichtman's opinion that black candidates are "essentially blocked from any significant electoral success " (emphasis added). The court also explicitly placed emphasis on the historical data about county-wide elections, noting that blacks had been remarkably unsuccessful. While the election results and a dearth of successful black candidates may be relevant to the question of whether voting in the County is racially polarized, such evidence has little direct probative value on the question of whether particular single-member districts are established in a manner that dilutes the black vote. White bloc-voting is relevant, as already observed, to the analysis of districting plans involving a multi-member district or a multi-district county. But when the white bloc vote, even though monolithic, cannot defeat the protected voting group because the protected group is in fact the voting majority, both in a majority of the districts and in the county, the data has little probative value.
 
 
 38
 The state must guarantee equality of voting opportunity, but it cannot guarantee equality of success, and the Voting Rights Act expressly so specifies. Moreover, the state need not draw district lines to give greater weight to the portion of the black population which votes for black candidates than the portion which votes for white candidates. There is simply no precedent or principle to support the argument that the vote of cross-over black voters must be undervalued. If the voting group of blacks have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted. Stated otherwise, when a racial (or language) minority becomes the voting majority in a single-member district, it is empowered with the vote in that district. And when a racial (or language) minority becomes the voting majority in a majority of the districts, it is empowered to elect a majority to the governing body. The goals of the Act in these circumstances are fulfilled, and the district court erred in rejecting the County's plan and in requiring further adjustments to increase the chances of actual success by blacks at the polls.
 
 
 39
 In summary, we hold that when black voters have equal access to the polls and in fact represent a majority of those eligible to vote in a majority of the election districts relevant to the governmental body at issue, the rights afforded by the Fifteenth Amendment and the Voting Rights Acts are satisfied. Under such circumstances, judicial inquiry into the electoral success of black candidates begins an inappropriate process of affirmatively establishing quotas to assure results and concomitantly denying other classes of persons equal access to the political system.
 
 III
 
 40
 Because we conclude that the July 1991 plan adopted by Brunswick County was lawful, we need not reach the issue of whether plaintiffs are bound by a settlement agreement approving the plan or the other procedural issues raised by the County. We reverse the judgment of the district court and remand with directions that the court vacate its orders of June 5, 1992, June 10, 1992 (amending its order of June 5, 1992), July 30, 1992, and August 10, 1992, and enter an order approving and implementing the plan adopted by the County on July 31, 1991.
 
 
 41
 REVERSED AND REMANDED.
 
 
 
 [1]
 The 1971 redistricting plan, however, was later challenged in a suit filed in September 1988 by the same persons who are plaintiffs here. In White v. Daniel, 909 F.2d 99 (4th Cir.1990), we directed that that action be dismissed, concluding that the 17-year delay in its filing, combined with the fact that no further elections were scheduled to occur before the next census, barred the action under the doctrine of laches. The plaintiffs filed a petition for a writ of certiorari in the Supreme Court. Certiorari was denied on the plaintiffs' motion when it was believed a settlement in this case had been reached. --- U.S. ----, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991)
 Population Percent Black
 1971 1981 1971 1981
Dist. 1 3,259 3,325 49.9% 50.7%
Dist. 2 3,143 3,021 66.2% 64.2%
Dist. 3 3,330 3,047 54.7% 54.6%
Dist. 4 3,208 3,139 69.2% 68.6%
Dist. 5 3,232 3,100 51.5% 49.1%
 ------ ------ ------- ------
Total 16,172 15,632 58.2% 57.4%
 
 
 [2]
 This earlier litigation was still pending at the time, see footnote 1, supra
 
 
 [3]
 The student body at St. Paul's College, located in District 5, is predominantly black. Because most of the students come from outside the County, however, plaintiffs contended that the College's student population should not be included in the population statistic considered in redistricting. When the student population of St. Paul's College is excluded, the black population of District 5 under the County's plan drops from 62.7% to 55.1%
 
 
 [4]
 The plan of July 1991 is the plan that was adopted by the County and utilized in conducting the special election on April 7, 1992
 
 
 [5]
 These figures include the students of St. Paul's College
 
 
 [6]
 These data, based on the opinion of Dr. Lichtman, might be subject to further scrutiny because the question of how voters vote is always cause for speculation. Moreover, while plaintiffs assume that about 20% of the blacks have regularly crossed over and voted with the whites in Brunswick County, it could just as well be that 40% crossed over as did 20% of the whites, netting the same result. The outcomes of past elections and the variations in the votes for blacks and whites over the years belie any pat conclusions. If Dr. Lichtman's opinions are accepted as correct, then the plan approved by the district court in its August 10, 1992, order still did not put a high enough percentage of blacks in the black districts to neutralize the 20% black cross-over assumed to exist by Dr. Lichtman. He concluded that the district would have to be 65% black. For purposes of our analysis, however, we take no issue with the district court's findings with respect to Dr. Lichtman's opinions
 
 
 [7]
 During the most recent ten years, from 1981 until the time of trial, the evidence also showed that blacks voted in greater proportions than whites (52% of the eligible blacks to 41% of the eligible whites)