NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., Plaintiffs,

v.

KERSHAW COUNTY, SOUTH CAROLINA, et al., Defendants.

Civ. A. No. 3:90–1132–19.

United States District Court, D. South Carolina, Columbia Division.

Nov. 24, 1993.

---

John R. Harper, II, Columbia, SC, and Willie Abrams, NAACP Sp. Contribution Fund, Inc., Baltimore, MD, for plaintiffs.

J. Kennedy Dubose, Jr., Holland, Dubose & Cushman, of Camden, SC, Helen T. McFadden, of Kingstree, SC, Roy Dawson Bates, Columbia, SC, and Carl R. Reasonover, of Camden, SC, for defendants.

## MEMORANDUM OPINION
## AND ORDER

SHEDD, District Judge.

On August 5, 1992, the Court ruled that the at-large method of electing members of the Kershaw County Council violated Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, in that the county's African–American minority population had less opportunity than other members of the electorate of Kershaw County to participate in the political process and to elect representatives of their choice. The Court enjoined the defendants from holding further elections under the invalidated election plan and ordered the defendants to submit a remedial plan to cure the Section 2 violation. The defendants' remedial plan, which was submitted to the Justice Department pursuant to Section 5 of the Voting Rights Act, was pre-cleared by the Justice Department by letter dated May 26, 1993.

On September 23, 1993 the Court held a hearing to determine whether the defendants' proposed remedial plan complied with Section 2 of the Voting Rights Act. Under the remedial plan submitted by the defendants, the Kershaw County Council would consist of seven members. The plan creates six single-member districts in Kershaw County, two of which are asserted to be African–American "opportunity districts."[1] The seventh member of the County Council, who would serve as the Chair of the Council, is elected at-large to a specific seat as required by South Carolina law.[2]

### I.

In determining whether the defendants' proposed plan remedies the Section 2 violations found by the Court during the liability stage of these proceedings, the Court "may only consider whether the proffered remedial plan is legally unacceptable because it violates anew constitutional or statutory voting rights—that is, whether it fails to meet the same standards applicable to an original challenge of a legislative plan in place." *McGhee v. Granville County*, 860 F.2d 110, 115 (4th Cir.1988). Because the proposed remedial plan must pass both constitutional and statutory muster, the Court must first determine whether it violates either the Fourteenth or Fifteenth Amendment. If the plan passes constitutional scrutiny, the Court must then determine whether it violates Section 2 anew. *Cf. McGhee*, 860 F.2d 110.

### A.

The Court finds that the proposed remedial plan does not violate the Fourteenth Amendment. First, the proposed plan complies with the "one person, one vote" standard mandated by the equal protection clause. *See Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The 5.94 percent total variance of the six proposed districts is well below the 10 percent *de minimis* threshold established by Supreme Court precedent. *See Connor v. Finch*, 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977).

Moreover, to prove a violation of the Fourteenth Amendment, a plaintiff must establish discriminatory intent on the part of the defendants. *See Irby v. Virginia State Board of Elections*, 889 F.2d 1352, 1355 (4th Cir.1989), *cert. denied* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990). ("To establish an equal protection violation, a plaintiff must show discriminatory intent as well as dispa-

---

1. An "opportunity district" is one in which members of the protected class at issue constitute a majority of the voting age population.

2. Pursuant to South Carolina law, "[i]n those counties in which the chairman of the governing body was elected at-large as a separate office prior to the adoption of one of the alternate forms of government provided for in [the Home Rule Act], the chairman shall continue to be so elected." S.C.Code Ann. § 4–9–90. The 1966 Act which established the Kershaw County Council states that the council shall consist of five members who are elected at-large countywide. *See* Act 881, Statutes at Large of South Carolina, 1966, p. 2214. One of the five seats on the council is set aside for a chairperson, and candidates seeking the chair position announce they are specifically running for that seat. *Id.* Prior to the County's adoption of a form of government under the Home Rule Act, therefore, the chairperson of the Kershaw County Council was elected at-large as a separate office. Accordingly, section 4–9–90 requires that the chairperson continue to be elected at-large.

rate effect.'"). The only evidence of discriminatory intent presented by the plaintiffs is the plan's retention of the at-large election of the Chair and the defendants' alleged failure to ensure that District 1 is a true "opportunity district." The Court, however, has previously found that "the plaintiffs have failed to prove, by a preponderance of the evidence, that race was a motivating factor in choosing the at-large method of electing members, including the Chairman[,] of County Council." Transcript of the Court's Oral Order of August 5, 1992 at 6, ¶ 5 (referring to the original selection of the at-large method of electing members in 1966). Moreover, nothing in the record suggests that the defendants' retention of the at-large method of electing the Chair of County Council is a result of discriminatory intent. Finally, as discussed *infra*, the Court finds that District One is a true "opportunity district." The Court, therefore, finds that the remedial plan proposed by the defendants was not created with the intent to dilute African–American voting strength in Kershaw County or to otherwise discriminate against the African–American voters of Kershaw County. The plan, therefore, does not violate the Fourteenth Amendment.

### B.

Similarly, to establish a violation of the Fifteenth Amendment, a plaintiff must prove discriminatory intent. *See Irby*, 889 F.2d at 1355. *Cf. Republican Party of North Carolina v. Martin*, 980 F.2d 943, 955 (4th Cir.1992), *cert. denied* —— U.S. ——, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993) (To establish a constitutional violation on the basis of alleged gerrymandering, a plaintiff must show "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group."). Because the record contains no evidence of discriminatory intent, plaintiffs have failed to prove a violation of the Fifteenth Amendment.

### II.

Having found that the proposed remedial plan complies with both the Fourteenth and the Fifteenth Amendments, the Court must now determine whether the proposed remedial plan violates Section 2 of the Voting Rights Act. The plaintiffs contend that the proposed plan violates Section 2 in two respects. First, the plaintiffs claim that the districts as drawn provide African–Americans less opportunity than other members of the electorate to elect representatives of their choice because District 1 is not a true "opportunity district." The plaintiffs also argue that the at-large election of the Chair of County Council constitutes a separate violation of Section 2.

### A.

Plaintiffs first argue that because District 1 is not a true African–American opportunity district, the proposed remedial plan provides African–Americans the opportunity to elect only one out of seven candidates of their choice to the County Council. Plaintiffs argue that this violates Section 2 because African–Americans' candidates of choice will comprise only 14.29% of the County Council although African–Americans make up 28.3% of the population of Kershaw County. The defendants counter by arguing that District 1 is an "opportunity district" because African–Americans constitute a majority of the voting age population in that district.[3] The defendants argue that if they vote cohesively, the African–American constituents in District 1 can elect the candidate of their choice to the County Council regardless of the voting patterns of any other group of constituents within that district.

The Court finds that District 1 is in fact an African–American opportunity district. As recently explained by the Fourth Circuit, "[a]lthough voter empowerment encompasses the right to have free and equal access to the ballot box and to have the vote that is cast count the same as any other person's, it does not endow the voter with the right to have his or her vote cast for the winner." *Smith v. Brunswick County*, 984 F.2d 1393, 1398 (4th Cir.1993). Accordingly,

---

**3.** African–Americans make up 61.48% of the total population of District 1 and 57.86% of the voting age population of District 1. There is no incumbent in District 1.

[i]f the voting group of blacks have the numbers necessary to win and members of the group are allowed equal access to the polls, it cannot be rationally maintained that the vote is diluted. Stated otherwise, when a racial (or language) minority becomes the voting majority in a single-member district, it is empowered with the vote in that district.

*Brunswick County,* 984 F.2d at 1401.

The undisputed evidence indicates that African–Americans constitute 57.86% of the voting age population of District 1, and the Court has already found that "there are no official or unofficial barriers to registering to vote in Kershaw County or to casting a ballot in Kershaw County." Transcript of the Court's Oral Order of August 5, 1992 at 10, ¶ 12. The testimony of the plaintiffs' expert that, despite these facts, District 1 is not an African–American "opportunity district" is based on speculation and is not accepted by the Court. Conversely, the evidence presented by defendants' expert witness, who employed scientifically and legally accepted methods of analysis, clearly establishes that District 1 is an opportunity district for African–American voters in Kershaw County.

### B.

Plaintiffs next claim that electing the Chair of County Council at-large violates Section 2 of the Voting Rights Act by providing African–Americans with less opportunity than other members of the electorate to participate in the political process. Plaintiffs base this contention on the argument that African–Americans, who comprise only 28.3% of the population of Kershaw County, will be unable to elect a candidate of their choice to the position of Chair of County Council. The gravamen of plaintiffs' argument is that for African–Americans to be accorded full access to and participation in the electoral process, they must be accorded more opportunity to serve as Chair than would be created by the proposed remedial plan. Although the plain-

tiffs never stated their position in such explicit terms, it is clear from the extensive argument presented on this point that their position must follow one of two courses. First, if the Chair is viewed as simply another member of Council, the plaintiffs argue that even after African–Americans are granted two opportunity districts, thereby approximating proportional representation, the legislature may not adopt a mixed plan by which some or all of the remaining seats are filled by at-large elections. Alternatively, if the Chair is viewed as a separate and distinct office—akin to a governor or mayor—the plaintiffs' argument is that such a unitary office violates the Voting Rights Act. The Court will address each argument in turn.

■ The Court will first address the argument which assumes that the Chair is the functional equivalent of any other member of Council because the Court has already found this to be the case. *See* Transcript of the Court's Oral Order of August 5, 1992 at 3–4, ¶ 3. The plaintiffs' argument that even given the two African–American opportunity districts, a remedy which subjects one or more of the remaining seats to at-large elections violates the Voting Rights Act fails for one simple reason: even if the Voting Rights Act is seen as requiring a remedy which approximates proportional representation,[4] the Court is aware of nothing in the text of the Voting Rights Act, in controlling case law, or in public policy which requires or even supports overproportional representation. *See Ahoskie,* 998 F.2d at 1274 ("Nothing in the Act requires a remedy imposing overproportional representation."). Once the legislative body has offered a remedy by which "the protected voting group has a voting opportunity that relates favorably to the group's population in the jurisdiction for which the election is held," *Id.* at 1272, the Court must not only respect, but indeed must "accord[ ] great deference to [such a] legislative choice." *Id.* at 1271.

---

**4.** *Cf. Hines v. Mayor and Town Council of Ahoskie,* 998 F.2d 1266, 1272 (4th Cir.1993) ("Th[e] measure of vote dilution ... creates what amounts to a right to usual roughly proportional representation on the part of sizeable, compact,

cohesive, minority groups.") (quoting *Thornburg v. Gingles,* 478 U.S. 30, 91, 106 S.Ct. 2752, 2787, 92 L.Ed.2d 25 (1986) (O'Connor, J., concurring)).

■ Moreover, legislatively-proposed mixed plans are not *per se* violative of Section 2; to the contrary, they are acceptable. In *Ahoskie,* for instance, the Fourth Circuit found that a legislatively-proposed mixed plan complied with Section 2, stating that "in fashioning an appropriate remedy, legislatures are not limited to single-member district plans" and that "only when the evidence suggests that the legislature has chosen [an aspect of the plan] 'solely to diffuse [minority] voting strength' should a federal court not accord [great] deference [to the legislatively-proposed plan]." *Id.* at 1271. Having found that the defendants have not selected the proposed plan in order to diffuse minority voting strength, the Court will accord deference to their legislative choice and accept the proposed plan.

The Court will next address the plaintiffs' alternative argument, which is premised on the assumption that the Chair is a unitary office akin to mayor or governor. The Court first notes that this argument is invalid by virtue of the Court's finding that the Chair is the functional equivalent of any other Council member. Moreover, although unitary offices have been subject to attack under Section 2, *see Dillard v. Crenshaw County,* 831 F.2d 246 (11th Cir.1987); 62 U.S.L.W. 3261, 3261–63 (U.S. Oct. 12, 1993) (discussion of oral argument before the United States Supreme Court in *Holden v. Hall,* No. 91–2012), the Court is aware of no authority for the proposition that such unitary offices are *per se* illegal. The Court, however, finds that the analysis employed by the *Dillard* court provides the best framework for analyzing the plaintiffs' argument that at-large election of the Kershaw County Chair violates Section 2.

Applying the *Dillard* analysis to the instant case indicates that the at-large method of electing the Kershaw County Chair is not violative of the Voting Rights Act because of factual distinctions between *Dillard* and the instant case. First, the actual duties and status of the at-large commissioner in *Dillard* were uncertain. The position, which was created by the remedial plan at issue in

that case, had never been filled and the statutory description of the position was vague at best. By contrast, the Kershaw County Chair is not a newly-created and relatively undefined position. Instead, it is merely a continuation of an office which has been in place nearly 30 years, and the duties of the position, which are defined both by statute and by past practice, are minimal.[5]

Moreover, the *Dillard* court expressed concern over the fact that the commissioner position at issue was a full-time position and suggested that a full-time administrator might be a more palatable alternative. By contrast, the Kershaw County Chair, like all other seats on the Council, is a part-time position. Moreover, the 1966 statutory scheme which established the at-large Chair in Kershaw County also established a "county manager." Accordingly, the driving force behind the *Dillard* decision—the possibility of an "unacceptable gravitation of power to the chairperson", 831 F.2d at 252—is simply not present in this case. Pursuant to the *Dillard* analysis, therefore, the proposed remedial plan's at-large method of electing the Chair of County Council is not violative of the Voting Rights Act.

Finally, ruling that a legislative body may not adopt a plan which includes a unitary office would be tantamount to ruling that at-large elections, at least of unitary officers such as governor or mayor, are *per se* illegal. Such a ruling would be in direct contradiction of both the intentions of Congress in enacting the 1982 amendments to the Voting Rights Act and Supreme Court precedent. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 16 (1982), U.S.Code Cong. & Admin.News 1982 at pp. 177, 193 (One of the "key findings" of the Senate committee report accompanying the 1982 amendments to the Voting Rights Act was "[e]lectoral devices, including at-large elections, *per se* would not be subject to attack under Section 2."); *Thornburg v. Gingles,* 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986) (At-large elections "may not be considered *per se* violative of § 2 [of the Voting Rights Act].")). Accordingly, the

---

5. Moreover, the Court has found that neither the creation of the office of Chair nor the duties assigned to the Chair are the result of or the effect of any discriminatory intent. See *supra* at I.A.

court will accord deference to the legislative plan proposed by the defendants and accept the plan.

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that ·the remedial plan proposed by the defendants be **ACCEPTED** and that the date of this order shall serve as the "beginning date from which to ascertain the schedule for filing, primaries and the general election" described in the Ordinance passed on third reading by the Kershaw County Council on October 6, 1992.

**IT IS SO ORDERED.**